**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

NYRIAL J. REYNOLDS,                                    Case No. 1:14-cv-742

        Plaintiff,                                                   Beckwith, J.
                                                                           Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Nyrial J. Reynolds filed this Social Security appeal in order to challenge the Defendant's finding that she is not currently disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. The Commissioner filed a response, to which Plaintiff filed a reply. As explained below, the ALJ's finding will be REVERSED, because it is NOT supported by substantial evidence in the administrative record.

**I. Background**

On June 17, 2011, Plaintiff filed an application for disability insurance benefits ("DIB"), alleging disability beginning May 17, 2011 based upon a combination of physical and mental impairments, including but not limited to COPD and depression. Her claim was denied initially and upon reconsideration, following which she filed a written request for an evidentiary hearing before an administrative law judge ("ALJ"). On January 18, 2013, Plaintiff appeared in Dayton, Ohio, at a video-conferenced hearing at which ALJ Lorenzo Level presided from Chicago, Illinois. After being advised of her right to representation, Plaintiff voluntarily waived that right and proceeded

without the assistance of counsel or other representation.[1] On May 31, 2013, ALJ Level issued an adverse written decision.

Plaintiff was 55 years old, in the "advanced age" category at the time of that decision. Plaintiff spent eight years in the air force, and receives treatment through the Veteran's Hospital. She is divorced and resides with her adult daughter, her grandson, and a friend. In 2005, she completed a four-year college degree and has also completed some master's level coursework. Near in time to when she filed her application for DIB, she filed a claim and was approved for disability retirement through her federal employer, the Veterans Administration Office of Personnel Management. (Tr. 217).

The ALJ found that Plaintiff has the following severe impairments: "depression, panic attacks, personality disorder, dysthymia, asthma, COPD, dyspnea, degenerative joint disease of the shoulder, degenerative joint disease of the knees, obesity, degenerative disc disease, and sleep apnea." (Tr. 16). Additionally, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since her alleged onset date, and that she could no longer perform her past skilled work as an accounting clerk, nor could she perform past relevant work as a commercial cleaner due to its heavy exertional level. (Tr. 25). Nevertheless, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform medium unskilled work, further limited as follows:

> She can frequently balance, stoop, kneel, crouch, crawl and climb ramps and stairs. She can occasionally climb ladders, ropes, and scaffolds. She must avoid concentrated exposure to pulmonary irritants such as dusts, fumes, odors, gasses, and poor ventilation and concentrated exposure to work hazards such as unprotected heights and dangerous moving

---

[1] Plaintiff reported to a clinician on September 20, 2012 that she "refused to hire an attorney, as she believed that she was fully entitled to her benefits and saw no reason why she should lose some income to an attorney."

2

machinery. Her mental impairments limit her to understanding, remembering, and carrying out simple instructions and performing simple tasks with occasional interaction with the public, co-workers, and supervisors. She must not be subject to production-rate pace work such as assembly line work or production quotas (or any other production requirements above and beyond normal work expectations).

(Tr. 19). Considering Plaintiff's age, education, experience and RFC, and further based upon the testimony of a vocational expert ("VE"), the ALJ determined that significant numbers of jobs exist in the national economy that Plaintiff can perform, including representative occupations such as stock clerk or linen room attendant. (Tr. 25-26). Therefore, the ALJ found that Plaintiff was not under a disability and not entitled to benefits. (*Id.*).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Defendant's final determination. Represented by counsel on appeal to this Court, Plaintiff argues that the ALJ erred by rejecting the opinion of her treating psychiatrist that she was disabled based upon her mental limitations, and by finding her not to be fully credible.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported

3

by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). In other words, this Court must affirm even if the Court itself might have reached a different conclusion in reviewing the same evidence. As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the

4

claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Specific Errors

Plaintiff challenges only the ALJ's findings concerning her mental limitations; therefore, she has waived any challenge to the ALJ's findings concerning her physical limitations.[2] With respect to her mental limitations, Plaintiff argues that the ALJ erred by rejecting the opinions of Dr. Charles Walters, her long-term treating psychiatrist. In her second assertion of error, Plaintiff argues that the ALJ improperly assessed her credibility.

### 1. Error Re Treating Physician Opinion

The record reflects that Plaintiff has suffered from chronic depression for at least 16 years, and that Dr. Walters has provided her with mental health treatment for more than a decade, since 2002. However, Plaintiff continued working until her disability onset date of May 17, 2011.

On June 7, 2011, citing review of both his own records and those of other providers, Dr. Walters wrote to the Federal Employees Retirement System in support of Plaintiff's application for disability retirement benefits.[3] In that letter, Dr. Walters stated that Plaintiff's "depressive symptoms have never been in remission in spite of exhaustive pharmacologic trials with a wide array of antidepressant medications…." and

---

[2] Plaintiff begins her argument by stating that "Although…Ms. Reynolds would contend that she is unable to perform medium exertional work based on her physical impairment and could not perform either light or medium work activity, her mental impairments disable her from all work activity."(Doc. 9 at 11). No further statements or argument refer to physical limitations.

[3] Proof of a "disability" for purposes of social security benefits differs from that required under the Federal Employees Retirement System.

5

that her illness has been "refractory to pharmacologic treatment and counseling interventions for the past several years." (Tr. 267). The letter explains that her depressive symptoms worsened after the death of her mother in 2009, and that her symptoms "have included the following: severe social isolation and withdrawal; low self esteem; inability to concentrate; hopelessness; suicidal ideation; crying episodes; depressed mood, sadness; inability to effectively deal with life's stressors; inability to leave home due to anxiety and panic attacks, low energy, fatigue and hypersomnolence." (*Id.*).

Dr. Walters opines that Plaintiff has been highly motivated to work, using sick leave when unable to perform her job duties due to depression, but "forc[ing] herself to come in to work in spite of her depression," to the point of accruing a deficit of advanced sick leave. (Tr. 267). The letter concludes by opining that Plaintiff "is unable to return to work and is assessed as totally and permanently disabled. Her Major Depressive Disorder, Recurrent, Severe is assessed as static and unlikely to remit in spite of medication compliance." (*Id.*). The letter states the results of Plaintiff's last mental status exam of July 6, 2011, and pronounces in its last sentence that "Ms. Reynolds is assessed as permanently and totally disabled from all remunerative employment." (Tr. 268). A clinical progress note dated June 17, 2011 similarly reflects the opinion that Plaintiff is "permanently and totally disabled and unable to do her job," as does a single sentence penned by Dr. Walters on a prescription pad the same date. (Tr. 266, 491).

The ALJ rejected Dr. Walters' opinions that Plaintiff was totally disabled by her mental impairments. Noting that VA records "describe medication management with waning and waning symptoms, (Tr. 22), the ALJ stated he was "not persuaded that the claimant's impairments preclude her from all competitive work." (Tr. 24).

6

> While mental health diagnoses are acknowledged, the record also notes that the claimant reported that she had never been hospitalized prior to 2012 and had been treated for depression and anxiety since 1996…. Notwithstanding, the claimant successfully worked until 2011 with these conditions. *The fact that the impairment(s) did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work.* Additionally, it appears that her treatment providers rely strongly on the claimant's self-reported mental limitations. For example, the claimant's therapist stated that the claimant cannot maintain her own apartment or make her own car payments but also opined that the claimant is capable of managing any benefits that may be due (Exhibit 6F). The claimant also testified that she is able to maintain her living area and manages her own funds….

(Tr. 24, emphasis added). The ALJ specifically gave "[n]o weight…to the cursory statements" of Dr. Walters that Plaintiff "is permanently and totally disabled and unable to return to work" because Dr. Walters did "not provide any specific functional limitations" and his opinions were "not supported by the longitudinal record which documents improvement with appropriate treatment." (Tr. 24-25). Last, the ALJ disavowed the statement because "the issue of disability is reserved to the Commissioner." (Tr. 25).

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

7

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)).  Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."  *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

Plaintiff first argues that the ALJ should have deferred to Dr. Walters' opinions that Plaintiff was disabled.  However, the ALJ did not err in declining to give any weight to that particular "opinion," because it is not the type of <u>medical</u> opinion to which deference is due.  Instead, the ALJ correctly noted that the determination of whether a claimant is disabled is "reserved to the Commissioner."  20 C.F.R. §404.1527(d).

Nevertheless, the undersigned agrees with Plaintiff that the ALJ failed to provide "good reasons" for giving "no weight" at all to any of Dr. Walters' opinions, and that substantial evidence in the record as a whole does not support the non-disability finding. While Dr. Walters' opinions might have been more easily interpreted with a check-list style mental functional capacity report, he did include specific opinions that Plaintiff was far more restricted by her mental limitations than determined by the ALJ.  He describes the progressive worsening of Plaintiff's intractable depression leading to "severe social isolation and withdrawal" and an "inability to leave home due to anxiety and panic attacks," combined with severe fatigue and hypersomnolence.  Plaintiff's testimony concerning the progression of her symptoms was consistent with those opinions; Plaintiff testified about her increased isolation and restricted ability to leave home other than for doctor's appointments, as well as her frequent need for naps due to her insomnia.

When rejecting a treating physician's opinions, an ALJ is required to consider the

8

length of treatment relationship, frequency of examination, nature and extent of the relationship, supportability, consistency, specialization, as well as other pertinent factors, *see* 20 C.F.R. §404.1527(c)(2).  While express articulation of every factor is not required, the ALJ's analysis here was overly restricted and failed to reference any of the relevant factors.   Dr. Walters treated Plaintiff regularly for more than a decade, specializes in psychiatric disorders, and expressed opinions that appear to be consistent with the record as a whole.  *Accord Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013)(ALJ failed to identify the substantial evidence that was purportedly inconsistent with treating psychiatrist's opinions, where treatment notes of psychiatrist and therapist provided detail about the severity of the symptoms that plaintiff suffered,  and there was no evidence that the conflicting evidence consisted of anything "more than the [conflicting] medical opinions of the nontreating and nonexamining doctors.").

      The ALJ's reference to Plaintiff's "waning and waxing symptoms" does not provide grounds for rejecting Dr. Walters' opinions.  Other than his own opinion, the ALJ provides no support for his statement that the fact that Plaintiff was able to work for so many years with chronic depression "strongly suggests that it would not currently prevent work."   Many chronic conditions can become disabling over time.  As Plaintiff points out, the Commissioner's own regulations explain that psychiatric symptoms may be "intermittent or continuous depending on the nature of the disorder," and emphasize the need for longitudinal evidence over time in order to properly evaluate a claimant's level of functioning.  *See generally*, Listing 12.00B and 12.00C.  Here, the ALJ's conclusion that "the longitudinal record… documents improvement with appropriate treatment" is unsupported by the treatment records of Dr. Walters, Plaintiff's treating

9

psychologist, or any records either cited by the ALJ or that the undersigned has reviewed.

Notably, the ALJ cites as evidence of longitudinal improvement Plaintiff's good results on Prozac, noting that "in December 2010, the claimant reported that she was working at two jobs and had no problems with sleep and no exacerbation of depressive symptoms." (Tr. 20). However, Plaintiff's entire claim is premised on her contention that her depression worsened and became unmanageable *after* December 2010, with a disability onset date in May 2011. In several instances, the ALJ expresses or implies that "improvement" is shown when none is apparent. For example, the ALJ states that Plaintiff "complained of feeling tired despite wearing her CPAP machine at night but acknowledged that her inability to sleep was likely related to family issues (Exhibit 3F)." (Tr. 23). It is unclear why Plaintiff's insomnia would be less debilitating if caused by her mental impairment. Moreover, the citation to the record is not accurate. The referenced exhibit reads: "Her depression is not manageable effectively with the current med., she is compliant with her medications. States she has not been able to sleep for months. She feels tired most of the time despite wearing her C-pap machine every night. She is …also having problems with family issues due to her depression." (Tr. 270).

Other longitudinal records also support Dr. Walters' opinions that Plaintiff's symptoms grew more severe over time. Based on MMPI-2 testing, Dr. De Marchis, Plaintiff's treating psychologist, confirmed on July 22, 2011 that she had a diagnosis of major depressive disorder with a "guarded" prognosis. (Tr. 274). Like Dr. Walters, Dr. Marchis opined that "this employee is an appropriate candidate for disability services and is not seeking disability services for secondary gain."

On July 7, 2011, Plaintiff's treating physician Dr. Afaz similarly opined that

10

Plaintiff's depression had become resistant to both medications and psychotherapy to the point that she was no longer able to function on the job. (Tr. 269). Plaintiff's psychotherapist, Mr. Rusk, described Plaintiff as "severely and chronically depressed and …not employable at this time," encouraging her to "apply for whatever disability benefits she is entitled to." (Tr. 273). Finally, Plaintiff's mental condition deteriorated to the point that she required psychiatric hospitalization on October 6, 2012. (Tr. 1064). Upon admission, her GAF score was estimated to be 45, (Tr. 1066), although she improved and was "stable" upon discharge. (Tr. 990).

The ALJ discounted Dr. Walters' opinions because they rely upon Plaintiff's "self reported mental limitations." (Tr. 24). In the absence of greater explanation or analysis of inconsistencies between Plaintiff's self-reported limitations and other evidence of record, such criticism is inappropriate. Mental health providers typically rely at least somewhat upon "self-reported" limitations. The record here reflects regular and consistent treatment by Dr. Walters over more than a decade, and his opinion letter expressly relies on not only that lengthy treatment, but on the records of other providers.

The ALJ similarly rejected the opinions of Plaintiff's treating therapist, Licensed Independent Social Worker ("LISW") Gregory Rusk, that the claimant was not able to return to her employment and was not employable as of July 26, 2011. In part, the ALJ rejected his mental health assessment form because Mr. Rusk was not a physician or doctoral level psychologist and therefore "not an acceptable medical source" and because the issue of disability is reserved to the Commissioner…." (Tr. 25). On the surface, those reasons reflect no legal error. Nevertheless, Social Security Ruling 06-03p provides that opinions from "other sources" such as therapists or social workers should be evaluated using all relevant factors that would be applied to other medical

11

sources. The ALJ stated that Mr. Rusk's assessment was "not supported by the objective medical record," but again, the cited records appear to be selectively interpreted. Contrary to the ALJ's assertion that Mr. Rusk's opinions were unsupported by objective medical evidence, Mr. Rusk provided several objective reasons for his assessment, including that Plaintiff's Prozac dose was doubled in May 2011 without adequate symptom relief. The ALJ also notes that Mr. Rusk's records reflect that "claimant herself…discussed the possibility of different employment possibilities." (Tr. 25). However, despite Plaintiff's expressed hope to return to employment, the next sentence reflects Plaintiff's acknowledgment that her plan was "not feasible," and concludes with Mr. Rusk's professional opinion that Plaintiff is "not employable." (Tr, 273). On the record presented, Mr. Rusk's assessment should have been more carefully evaluated.

The ALJ's errors in failing to provide "good reasons" for the complete rejection of all of Dr. Walters' opinions and his somewhat cursory dismissal of Mr. Rusk's assessment were compounded by his decision to give "significant weight" to the September 2011 opinions of a one-time psychological consultant, Dr. Chiappone. (Tr. 22, citing Tr. 285-286). The ALJ also gave "some weight" to the two non-examining consultants. (Tr. 25).

The regulatory framework of the Social Security Act provides guidelines not only for the evaluation of the opinions of treating physicians, but for the evaluation of the opinions of consultants. In general, the opinions of a consulting physician who has actually examined the plaintiff will be given more weight than that of a non-examining consultant, with treating physicians alone to be given controlling weight. *See* 20 C.F.R. §404.1527(c)(1) and (c)(2). In *Blakley v. Com'r of Soc. Sec.*, 581 F.3d 399 (6th Cir.

2009), the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances, opinions from State agency medical...consultants...may be entitled to greater weight than the opinions of treating or examining sources." *Id.*, 581 F.3d at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). However, that is not the case when the consultants have not examined the complete record, and the ALJ fails to consider and articulate that fact. Thus *Blakley* reversed on grounds that the non-examining consultants did not have the opportunity to review "much of the over 300 pages of medical treatment...by Blakley's treating sources," and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions. *Id., quoting Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007); *see also Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)(Rejecting a medical opinion solely because a consulting physician disagrees is not an adequate basis for rejecting a treating physician's opinion).

In this case, neither Dr. Chiappone nor one of the non-examining consultants had access to Plaintiff's longitudinal mental health records, including those from Dr. Walters.[4] Additionally, both non-examining consultants and Dr. Chiappone issued their opinions *prior* to Plaintiff's psychiatric hospitalization. Dr. Chiappone assessed Plaintiff's GAF score at 45 indicating serious symptoms, but estimated her functioning at 55 "as she is capable of basic tasks." (Tr. 285). He diagnosed major depression and panic attacks without agoraphobia, reiterating a final GAF score of 45. He opined that she would "have difficulty dealing with stress and pressure on a jobsite." (Tr. 286).

On October 12, 2011, a non-examining reviewing consultant, Kristen Haskins, Psy.D., reviewed Dr. Chiappone's report and assessed Plaintiff with "mild" restriction of

---

[4] Dr. Chiappone's report indicates that the only collateral records that he reviewed were a single set of notes from Mr. Rusk dated July 2011.

13

activities of daily living, and moderate difficulties in maintaining social functioning and concentration, persistence or pace. (Tr. 64). Dr. Haskins disagreed with the low GAF score assessed by Dr. Chiappone as "not consistent" with his opinions, which she believed suggested that Plaintiff functioned with a GAF "in the mid 50's." (Tr. 67).

With her request for reconsideration, Plaintiff submitted records from Dr. Walters and Mr. Rusk to the agency. On April 4, 2012, Patricia Semmelman, a second non-examining consultant reviewing Plaintiff's claim on reconsideration, opined that Plaintiff was "fully credible." (Tr. 80). Dr. Semmelman found Plaintiff's ability to interact appropriately with the general public to be "<u>markedly</u> limited," with several other work-related abilities, including but not limited to the ability to get along with coworkers or peers, to be "moderately limited.". (Tr. 84-85, emphasis added). However, Dr. Semmelman agreed with Dr. Haskins that the GAF score found by Dr. Chiappone was overly low, with Plaintiff's GAF score "more likely in the mid 50's." (Tr. 85). Countering her initial favorable credibility determination, Dr. Semmelman wrote:

> Updated VA records shows increased depression due to not hearing from VA about their [retirement] benefits and recently turned down by SSI. The clt reported she has panic attacks and OCD but there is no indication of this in the most recent VA records….Neither the LISW nor the VA noted panic attacks in the tx notes over the past year or so. Given these inconsistencies the severity of the information provided at the Ce is less than fully credible and lesser wt given to the functional conclusions of the Ce.

(Tr. 86). The ALJ appears to have properly rejected this portion of Dr. Semmelman's opinion by finding Plaintiff's panic attacks to be a "severe" impairment. (*See e.g.*, Tr. 1088, noting diagnosis of panic disorder). Still, the ALJ failed to acknowledge and articulate appropriate reasons for giving greater weight to the opinions of Dr. Chiappone and the two consultants than he did to Plaintiff's long-term mental health providers, particularly given the consultants' limited access to relevant treatment records.

14

### 2. Credibility Assessment

Plaintiff's second assertion of error concerns the ALJ's credibility assessment. An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

The record reflects that Plaintiff had a lengthy work history of 36 years, including many periods in which she held two jobs at the same time. Two of Plaintiff's treating providers, Dr. De Marchis and Dr. Walters, specifically commented on her strong work ethic, which involved both missing treatment due to her work schedule (Tr. 275) and seeking out advance sick leave in an effort to continue working despite her illness. Plaintiff's treating psychiatrist, treating psychologist, and even the agency consulting psychologists all found her complaints to be "fully credible." (*See e.g.*, Tr. 65).

By contrast, the ALJ found Plaintiff's statements concerning her symptoms to be "not entirely credible for the reasons explained in this decision." (Tr. 20). He found inconsistencies based upon evidence that Plaintiff still could perform personal care, prepare meals, and do household chores such as dishes and laundry, and that she could attend medical appointments, shop approximately once every two weeks for 15-20 minutes (Tr. 212), and drive as necessary. (Tr. 19-20). The ALJ also pointed to

15

Plaintiff's report that her interests were reading "occasionally" and watching TV, that she was still able to attend church "on occasion," and socialize with others "on a limited basis." (Tr. 20, *see also* Tr. 213, Plaintiff's report that she "attempt(s)" to read and watch TV with limited success). The ALJ also noted: "She denied taking care of the children during the day and said that she and her roommate are helping each other but acknowledged that she occasionally watches her grandson." (*Id.*). The ALJ particularly focused on two records. In June 2012, Plaintiff reported she was "fairly busy running chores and errands for her daughter" despite persistent depressive symptoms, and in September 2012, she similarly admitted that she "enjoyed babysitting her grandson" despite her symptoms. (Tr. 753, 764, 1078).

      The ALJ's sharp focus on these references ignores that such activities of daily living do not necessarily support Plaintiff's ability to sustain full-time work. Even Dr. Chiappone suggested that Plaintiff's GAF score had improved after she quit work, and that she would have difficulty dealing with stress and pressure on a jobsite. *Accord Gayheart*, 710 F.3d at 377-378 (record that plaintiff could keep medical appointments, drive, visit friends, and shop did not suggest that plaintiff could perform any of those activities on a sustained basis; finding ALJ took examples out of context where record showed that driving triggered his anxiety, he avoids travel, and nothing in record showed he did the activities frequently, independently, and/or on a sustained basis). In the same clinical record in which Plaintiff admitted to occasionally babysitting her grandson, Plaintiff reported that she continued to feel depressed, lacked motivation, experienced insomnia and did not enjoy life. (Tr. 1078).

      The ALJ found it noteworthy that Plaintiff had not been psychiatrically hospitalized but until October 2012 and that she expressed she was "very happy with

16

the results" of an out-patient program she had enrolled in after being discharged from the hospital. (12F). (See also Tr. 20, noting that Plaintiff "has recently learned some coping skills" despite chronic depression). The ALJ asserted that Plaintiff planned to "wean down" her dose of Prozac from 60 mg to 40 mg after her hospitalization. (Tr. 1087). However, that description is misleading. Longitudinal records reflect that in January 2013, the treating psychiatrist chose to increase, not decrease, Plaintiff's Prozac, from 60 to 80 mg, based upon Plaintiff's lack of response to treatment and continued severity of her symptoms. (Tr. 1096-1098).

Despite the deference ordinarily given to an ALJ's credibility assessment, reconsideration of Plaintiff's credibility is appropriate on remand in view of the likelihood that the ALJ's assessment was inappropriately influenced by other errors in the record, including an inaccurate interpretation of some medical records.

### III. Conclusion and Recommendation

For the reasons discussed above, **IT IS ORDERED THAT** Defendant's decision be **REVERSED** and that this case be **CLOSED**.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge